IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-02695-PAB-KLM

FRANK LORD,

      Plaintiff,

v.

JASON HALL, Colorado Springs Police Officer,
RICHARD HAYES, Colorado Springs Police Officer, and
UNKNOWN COLORADO SPRINGS POLICE OFFICERS,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on the Motion for Summary Judgment [Docket No. 44] filed by defendants.  On July 26, 2010, Officers Jason Hall and Richard Hayes of the Colorado Springs Police Department performed an investigatory stop of plaintiff Frank Lord.  Plaintiff filed this 42 U.S.C. § 1983 action alleging that defendants violated his Fourth Amendment rights to be free from an unlawful arrest and from the use of excessive force.

**I.  BACKGROUND**

      At approximately 9:45 p.m. on the evening of July 26, 2010, an armed robbery occurred at the Western Convenience Store located at 1905 W. Uintah Street, Colorado Springs, Colorado.  Officer Juan Ramos of the Colorado Springs Police Department was the first officer to arrive at the store.  Officer Ramos interviewed the victim of the robbery as well as other witnesses.  Based on these conversations, Officer

Ramos gave a description of the suspect to the police department's dispatch officer. At

approximately 9:52 p.m., the dispatch officer reported the following over the police

department's radio system[1]:

> Robbery at the Western Convenience 1905 West Uintah Street, it says
> that there was a gun involved, it just occurred, suspect just left ran west
> towards the middle school.  Docket No. 48 (Dispatch recording at 2:05-
> 2:15).

> Suspect is described as a white male, 22 years old, five six with a thin
> build, blue eyes and uncolored hair, was seen wearing a fishnet over his
> face and also had a black hoodie and uncolored pants, suspect took
> money and is running southbound on 19th.  Docket No. 48 (Dispatch
> recording at 2:20-2:40).

> Had a person jump into a white ford pickup truck, one driver one suspect,
> the suspect had a black enforced semi-automatic handgun, got minimal
> cash . . . negative on the plates and was last seen westbound on
> Armstrong . . . on the vehicle it is going to be a single cab long bed, older
> pickup truck, probably ten to fifteen years old, full-size American.  Docket
> No. 48 (Dispatch recording at 2:58-3:45).

*See* Docket No. 48.  In addition, the dispatch officer reported the following information

that appears on the call screen[2] of the officers' patrol car:

> 21:53:03 **SUS IS A WM 22Y0 506/THN BLUE EYES**
> 21:53:03 **UNK HAIR COLOR...LSW FISH NET OVER HIS FACE**
> 21:53:16 **BLACK HOODIE UNK PANTS**
> 21:55:29 **WHITE FORD PICKUP, 1 DRIVER, 1 SUSP[ECT]**
> 21:56:05 **SUS BLK SEMI AUTO HANDGUN**
> 21:56:20 **WB ON ARMSTRONG**

---

[1]Every patrol car is equipped with a radio that relays information provided by the
dispatch officer which can be heard by all occupants of the patrol car.  Docket No. 47-4
at 2 (Hall Dep. 31:17-32:11).

[2]Police vehicles are equipped with a Mobile Digital Communicator ("MDC").
MDCs are laptops assigned to individual patrol cars on which officers receive crime
updates from dispatch.  An MDC, also known as a call screen, tracks the information
aired over the radio but uses abbreviations or shorthand to relay the relevant facts.
Docket No. 44-3 at 4 (Hayes Dep. 26:11-18).

21:56:50 **SINGLE LONG BED OLDER PICKUP**

Docket No. 47-1 at 1-2.

When dispatch reported the robbery, Officers Hayes and Hall were on patrol at a nearby location.  Officer Hall drove the patrol car while Officer Hayes monitored the call screen.  Although Officer Hall could not read the call screen, he could hear the information aired over the car radio.  Shortly after receiving the report, the officers activated the patrol car's emergency lights and drove towards the store to assist in the robbery investigation.

Mr. Lord had dinner that evening at a friend's house in Colorado Springs.  He left at approximately 10:00 p.m. with the intention of going to a nearby grocery store to purchase distilled water.  Mr. Lord drove a 1998, white Ford F-150 pickup truck with an extended cab.  Docket No. 44-4 at 7 (Lord Dep. 37:12-15).  As Mr. Lord traveled north on 19th Street towards the grocery store, he saw what he perceived to be police emergency lights in his rearview mirror and pulled over to the side of the road to yield the right-of-way.  *Id*. at 6 (Lord Dep. 34:13-18).

The officers, also headed northbound on 19th Street, noticed plaintiff's white pickup truck pulled over at the side of the road.  Docket No. 44-2 at 7 (Hall Dep. 51:14-15); Docket No. 44-3 at 9-10 (Hayes Dep. 38:25-39:3).  Because the officers believed that Mr. Lord's truck matched the description of the suspects' truck and because the truck was located approximately two blocks from the robbery, the officers decided to perform an investigatory stop.  Officer Hall pulled the patrol car in behind Mr. Lord's truck and directed a spotlight directly on it.  Docket No. 44-3 at 10 (Hayes Dep. 39:1-3).

According to Officer Hayes, Mr. Lord got out of the driver's side of the truck as soon as the spotlight shone on it and moved towards the patrol car without closing the truck's door.  *Id*. (Hayes Dep. 39:13-17).  Mr. Lord is sixty four years old with gray hair and is six foot four inches tall.  Docket No. 47-21 (offense report).  Officer Hall states that he was aware that there were two suspects to the robbery and thought Mr. Lord could be one of them.  Docket No. 44-2 at 6 (Hall Dep. 45:19-21).  He wrote in his police report that he "believed [Mr. Lord] and [Mr. Lord's] vehicle matched the description of the robbery suspect."  Docket No. 44-2 at 31 (Hall police report).  Officer Hall's report also states that "[t]he longer I was in contact with [Mr. Lord], the more suspicious I became of [Mr. Lord].  I believed [Mr. Lord] may have been the robbery suspect, and armed with a gun."  *Id*.  Officer Hayes, however, did not believe that Mr. Lord was the suspect of the robbery.  Docket No. 44-3 at 7 (Hayes Dep. 33:15-17).  Officer Hayes was aware that Mr. Lord did not match the description of the robber provided on the call screen.  *Id*. (Hayes Dep. 33:2-6).  Accordingly, Officer Hayes got out of the patrol car to investigate the passenger side of the truck for the robber or a weapon.  Docket No. 44-3 at 21 (Hayes police report).

As plaintiff walked towards the patrol car, Officer Hall commanded him to stop walking and not to move.  Docket No. 44-2 at 9 (Hall Dep. 54:25).  Mr. Lord, however, did not respond to Officer Hall's verbal commands and continued to approach the patrol car.  As he did so, Mr. Lord made several statements to Officer Hall, such as "[w]hat's your [G]oddamn problem? What the hell do you guys want? Can I go now?"  Docket No. 44-2 at 11 (Hall Dep. 56:3-4).  Officer Hall did not draw his weapon because he said he had full view of Mr. Lord's hands.  *Id.* at 8 (Hall Dep. 53:8-9).  Mr. Lord suddenly

4

stopped moving towards the patrol car and began to pace back and forth in the space between the patrol car and the pickup truck.  Officer Hall again believed that Mr. Lord could have been the robbery suspect because Mr. Lord "had a strange look on his face, [gave the] impression that he was contemplating his next move, as if he couldn't decide to run from police on foot or in his vehicle, or draw his gun."  Docket No. 47-5 at 2.  It then appeared that plaintiff decided to get back in his truck.  Docket No. 44-2 at 17 (Hall Dep. 67:2-10)

While Officer Hall yelled orders at Mr. Lord,[3] Officer Hayes made his way to the passenger side of the truck, periodically glancing at Officer Hall to ensure the situation with Mr. Lord was under control.  Officer Hayes remembers that, at one point, Mr. Lord attempted to re-enter the truck through the open driver door.  Officer Hayes ordered Mr. Lord to stay away from the vehicle because he was worried about an accomplice or a weapon inside the truck.

Officer Hall decided to prevent Mr. Lord from re-entering the pickup truck. Docket No. 44-2 at 17 (Hall Dep. 67:2-6).  He therefore approached Mr. Lord, grabbed Mr. Lord's arms from behind, and pulled him away from the truck and towards the patrol car.  *Id*. at 17-18 (Hall Dep. 67:25-68:6).  As Officer Hall moved Mr. Lord towards the patrol car, Mr. Lord asked Officer Hall "[w]hat the hell is wrong with you guys!" and "[w]hat the fuck are you guys doing!"  Docket No. 44-2 at 32 (Hall police report).  Mr. Lord then violently broke Officer Hall's grip, spun around to face Officer Hall, and began

---

[3]Officer Hayes states that he remembers Officer Hall yelling commands at Mr. Lord, but cannot remember what those commands were.  Docket No. 44-3 at 13 (Hayes Dep. 43:19-23).

to raise his hand up in what Officer Hall considered to be a fighting position.  *Id*. at 19 (Hall Dep. 69:1-9).  In response, Officer Hall lunged towards Mr. Lord, placed his right hand on Mr. Lord's chin, grabbed Mr. Lord's left arm, and attempted to take Mr. Lord to the ground with a front-leg sweep.  *Id*. at 20 (Hall Dep. 70:9-17).  Mr. Lord resisted by flailing his arms in an attempt to strike Officer Hall.  *Id*. at 21 (Hall Dep. 71:12-25).  Officer Hall remembers that, during the ensuing struggle, he tried to regain control of the situation and moved forward as Mr. Lord moved backwards in the direction of the pickup truck.  Officer Hall recalls that he could not see where they were going, but knows that they eventually ran into the back of the truck.  *Id*. at 22 (Hall Dep. 72:3-11).

While Officer Hall struggled to bring Mr. Lord under control, Officer Hayes determined that there was no one inside the truck.  Docket No. 44-3 at 15-16 (Hayes Dep. 46:24-47:2).  Officer Hayes saw Officer Hall struggling with Mr. Lord and saw them run into the back of the pickup truck.  *Id*. at 14 (Hayes Dep. 45:21-22).  Officer Hayes, however, could not see what happened once the pair hit the truck because his view was obstructed.

After striking the back of the truck, Officer Hall took Mr. Lord to the ground, placed both of his knees on Mr. Lord's back, and tried to secure Mr. Lord's right arm.  Docket No. 44-2 at 25 (Hall Dep. 75:13-16).  Mr. Lord continued to resist by moving his legs, shoulders, and arms.  As a result, Officer Hall could not get control of Mr. Lord's hands.  Once Officer Hayes secured the pickup truck, he made his way to the other side of the truck and could see Officer Hall kneeling on top of Mr. Lord struggling to gain control of Mr. Lord's right arm.  Docket No. 44-3 at 16 (Hayes Dep. 47:15-21).  To assist Officer Hall, Officer Hayes tried to grab Mr. Lord's left arm, but Mr. Lord pulled his

6

arm away and tried to tuck it underneath his body.  *Id.* at 17 (Hayes Dep. 49:14-17).

Officer Hayes believed that Mr. Lord could be attempting to access a weapon.  After

giving Mr. Lord commands to stop resisting, Officer Hayes struck Mr. Lord on the

shoulder four times with a closed fist.  *Id.* (Hayes Dep. 49:19-23).[4]  Eventually, the

officers placed Mr. Lord in handcuffs.  Officer Hall remained on top of Mr. Lord until

more officers arrived because Mr. Lord continued to resist.

Mr. Lord claims that he does not remember anything that occurred after he

pulled over and saw a very bright "white light."  Docket No. 44-4 at 11 (Lord Dep. 43:1).

However, Daniel Hensley witnessed the traffic stop from his residence at 1902 West

Platte Ave., Colorado Springs, Colorado.  Hensley recalls that, at approximately 10:00

p.m., he decided to go out on his porch to investigate the reason his dogs were barking.

Hensley had an unobstructed view of the scene from his porch which was

approximately 75 feet away from 19th Street.  Docket No. 49-1 at 5 (Hensley Dep.

11:3).  The first thing Hensley saw was Mr. Lord lying down on his stomach with one

officer on top of him and another officer to his side.  *Id.* at 6 (Hensley Dep. 16:1-13).

Hensley remembers one of the officers yelling "[w]here's the gun, Where's the gun?" to

which Mr. Lord responded "I don't have a gun; I don't have a gun."  *Id.* at 5 (Hensley

Dep. 14:9-13).  Hensley did not see Mr. Lord act in an aggressive manner, refuse to

perform any command, or act in a bizarre manner.  *Id.* at 9 (Hensley Dep. 27:10-20).

At some point, the officers noticed that Mr. Lord was bleeding, yet they could not

---

[4]Officer Hall also remembers that Officer Hayes struck Mr. Lord with a closed fist above the left shoulder because he could not control Mr. Lord's left hand.  Docket No. 44-2 at 25 (Hall Dep. 75:20-22).

tell when Mr. Lord injured himself.  Docket No. 44-3 at 19 (Hayes Dep. 53:17-18);

Docket No. 44-2 at 24 (Hall Dep. 74:15-16).  After more officers arrived at the scene,

the officers moved Mr. Lord from the street to the sidewalk.  Shortly thereafter, Officer

Ramos drove by the scene and notified the officers that Mr. Lord was not the robbery

suspect due to Mr. Lord being "an older guy."  Docket No. 47-9 at 3 (Ramos Dep.

22:25-23:3).  The officers then called an ambulance to tend to Mr. Lord's injuries.

When the ambulance finished treating Mr. Lord, Officer Craig Calkins

administered a sobriety test.  Officer Calkins determined that there was no indication

Mr. Lord had been smoking marijuana or drinking alcohol.[5]  Docket No. 47-12 at 7

(Calkins Dep. 37:8-13).  Officer Calkins also noticed that Mr. Lord had "an abrasion of

some kind on the side of his head."  *Id*. at 6 (Calkins Dep. 27:24-25).  After the sobriety

test, Officers Hall and Hayes arrested Mr. Lord and charged him with obstruction of a

peace officer in violation of Colo. Rev. Stat. § 18-8-104.  Docket No. 47-21.

Mr. Lord claims that he was in and out of consciousness after the traffic stop and

throughout the night he spent at the detention center.  Docket No. 47-10 at 6 (Lord Dep.

44:24-45:4).  Mr. Lord also asserts that he suffered broken ribs, pain in his lower back,

an abrasion above his right eye, and permanent brain damage.  *See* Docket No. 47-20.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

---

[5]Mr. Lord's preliminary breath test came back at zero.  Docket No. 47-12 at 7
(Calkins Dep. 37:12-13).

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Bd. of Regents of the Univ. of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

The officers claim that they are entitled to qualified immunity because plaintiff fails to raise a genuine dispute of material fact supporting a claim that defendants violated his Fourth Amendment rights. "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008). Under the first prong of the analysis, plaintiff is required to "establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003). The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007). Under the second prong, the plaintiff must show that the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds* by *Pearson*, 555 U.S. 223.

The Court may exercise its discretion in "deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson*, 555 U.S. at 236. The Court will begin by determining whether there has been a violation of plaintiff's Fourth Amendment rights.[6] To succeed with his § 1983 claims, plaintiff must first establish a deprivation of a federal right by a person acting under color of state law. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Here, because

---

[6]The Fourth Amendment applies to state actors by way of incorporation into the due process clause of the Fourteenth Amendment. *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). For ease of reference, the Court refers herein only to the Fourth Amendment.

Officers Hall and Hayes acted in their official capacities as state police officers, plaintiff has sufficiently shown that they acted under color of state law.  The focus, therefore, is on whether defendants deprived plaintiff of his federal rights.

The Supreme Court has identified three categories of police-citizen encounters: consensual encounters, investigative stops, and arrests.  *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).  "Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  *Id*.  An investigative detention, also called a *Terry* stop, is an encounter in which police may "stop and briefly detain a person for investigative purposes."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Such a stop is a Fourth Amendment seizure, but does not require probable cause because it is of limited scope and duration.  *Oliver*, 209 F.3d at 1186.  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that an investigative stop is lawful if (1) the stop is "justified at its inception," and (2) the resulting detention is "reasonably related in scope to the circumstances which justified the interference in the first place."  *Id*. at 20-21.  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."  *United States v. Winder*, 557 F.3d 1129, 1133-34 (10th Cir. 2009).  Nevertheless, an officer may detain a driver for reasons unrelated to the initial traffic stop if (1) the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring," or (2) "if the initial detention has become a consensual encounter."  *United States v. Cervine*, 347 F.3d 865, 868-69 (10th Cir. 2003).  Reasonable suspicion arises when "an officer of reasonable caution" has a "particularized and objective basis for

suspecting the person stopped of criminal activity" judged against the totality of circumstances. *Winder*, 557 F.3d at 1133-34. Although the detaining officer's subjective motivations are irrelevant to the inquiry, courts may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion. *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004).

## A.   Lawfulness of Traffic Stop

Mr. Lord does not argue that the officers lacked reasonable suspicion to perform the traffic stop.[7]  Instead, plaintiff argues that the officers' reasonable suspicion was dispelled once Mr. Lord got out of the truck and did not match the description of the suspect aired by the dispatch officer.  As previously noted, the officers reasonably interpreted the dispatches to indicate that the robber fled the scene in a white pickup truck, but was not the driver.  Moreover, no description was given of the driver.  Thus, the fact that Mr. Lord's appearance did not match the robber's description did not dispel the officers' reasonable suspicion to continue with their investigative stop.  Not until Officer Hayes determined that no one else was in the truck was reasonable suspicion potentially dispelled, but by that time Mr. Lord was struggling with Officer Hall, which the Court will separately address.

---

[7]The Court finds that the traffic stop was justified at its inception because the officers had particularized and objective information that (1) the suspect of the robbery fled in a white pickup truck, (2) Mr. Lord was driving a white pickup truck, (3) Mr. Lord's truck was two blocks from the location of the robbery, and (4) the officers reasonably interpreted information transmitted about the robbery to mean that the robber was not the driver of the white pickup truck. *See United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982) (finding that reasonable suspicion can rest upon the collective knowledge of the police).

Mr. Lord relies on cases involving mistakes by officers during the course of investigative stops.  In *United States v. Pena-Montes*, 589 F.3d 1048 (10th Cir. 2009), a police officer performed a traffic stop on a vehicle at night because he believed the vehicle did not have a license plate.  Once the officer performed the traffic stop, he noticed a temporary dealer plate on the vehicle.  *Id*. at 1050-51.  Nonetheless, the officer continued with the investigatory stop because he suspected the vehicle could have been stolen.  *Id*.  He eventually discovered that one of the passengers was an illegal alien.  *Id*.  The officer believed that, under New Mexico law, dealer plates could only be used during business hours.  *Id*. at 1053.  Relying on the officer's account of the traffic stop, the district court denied defendant's motion to suppress.  In reversing the district court, the Tenth Circuit found that the police officer lacked reasonable suspicion to continue the traffic stop because New Mexico law did not restrict the use of dealer plates to daytime hours.  *Id*.  The Tenth Circuit found that the police officer made a mistake of law and, absent the mistake of law, the officer would not have continued the stop.  *Id*. at 1054-55.  Accordingly, the Tenth Circuit held that, once the officer saw the dealer plates, his reasonable suspicion was dispelled and he should have discontinued the traffic stop because he no longer had reasonable suspicion that illegal activity had occurred.  *Id*.

The facts of this case are distinguishable from those presented in *Pena-Montes*. Unlike *Pena-Montes*, the Officer Hall's mistake in this case (believing that Mr. Lord was the "suspect") is a mistake of fact, and not a mistake of law.  The Tenth Circuit has held that an officer's reasonable mistake of fact may sustain a finding of reasonable

suspicion, while mistakes of law are presumptively unreasonable. *DeGasso*, 369 F.3d

at 1144.  Officer Hayes learned from the call screen that the suspect was not the driver

of the truck.  Because Mr. Lord came out of the driver's side door, it was reasonable for

Officer Hayes to believe that Mr. Lord could be involved in the robbery even if his

physical appearance differed from the description of the suspect. *See Fuchs v.*

*Sanders*, 659 F. Supp. 2d 1136, 1148 (D. Colo. 2009) (finding that a deputy Sheriff's

investigative traffic stop was reasonable under the Fourth Amendment even though the

female motorist's height differed significantly from the description aired on a police

dispatch of the male burglary suspect).  To the extent Officer Hall mistakenly believed

that Mr. Lord was the suspect of the robbery, he was nevertheless aware that two

suspects had fled the robbery.  Thus, Officer Hall's mistake does not dispel his

reasonable suspicion because, even while mistaking Mr. Lord's identity, he and his

partner still had to determine whether there were additional individuals in the vehicle.

Additionally, Officer Hall's mistake did not dispel Officer Hayes' reasonable suspicion.

Given that the officers did not have a description of the driver of the getaway car, the

officers were not limited to a visual inspection of Mr. Lord.  Officer Hayes could

reasonably believe that Mr. Lord was the getaway driver and therefore had enough

reasonable suspicion to proceed with the investigative stop.  In fact, as part of a lawful

investigative stop, the officers could have requested that Mr. Lord provide identification

and could have briefly detained him in order to verify his identify. *Hayes v. Florida*, 470

U.S. 811, 816 (1985); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (when an officer

has stopped a person based on reasonable suspicion of criminal activity, the officer

may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information").

Mr. Lord also cites *Brown v. Texas*, 443 U.S. 47 (1979), and *United States v. Green*, 879 F. Supp. 60 (W.D. Tex. 1995), in support of his argument that the officers' reasonable suspicion was dispelled.  In *Brown*, police officers patrolling a "high drug problem" area requested that Mr. Brown produce identification because he looked suspicious.  433 U.S. at 49.  The police officers had no reason to suspect Mr. Brown was involved in specific misconduct or any reason to believe he was armed.  *Id*.  The Supreme Court found that this stop exceeded the strictures of the Fourth Amendment because the police officers had no basis for suspecting Mr. Brown was involved in misconduct.  *Id*. at 52.  Unlike *Brown*, the officers in this case had sufficient reasonable suspicion, as discussed above, to believe that Mr. Lord was engaged in criminal activity.

In *Green*, police officers followed a Ford truck leaving the scene of a drug exchange with a confidential informant.  879 F. Supp. at 61.  When the truck left the scene of the exchange, it was driven by Roberto Perez.  *Id*.  Perez drove the truck to a Motel 6, whereupon Perez got out and another individual left the Motel 6 in the truck. *Id*.  The police officers, pursuant to a request from the Drug Enforcement Administration, performed a traffic stop on the Ford truck and found evidence linking the driver of the Ford truck to the earlier drug exchange.  *Id*.  In granting the defendant's motion to suppress, the district court found that the police officers did not have "reasonable articulable suspicion" that the driver of the Ford truck had committed a crime before they initiated the traffic stop.  *Id*. at 63.  The district court found that,

although the driver was in a vehicle that had earlier been used during a drug exchange, the police had no evidence linking the driver with the drugs other than the fact that he drove the vehicle. *Id*.

The situation in *Green* is distinguishable from the facts at issue here. In *Green*, the police officers knew that the individual driving the truck was not the person who had performed the earlier drug exchange and therefore required an independent basis to perform an investigatory stop. On the contrary, the police officers here did not know the identity of the driver and the circumstantial evidence surrounding the Mr. Lord's white pickup truck gave the officers specific articulable bases for suspecting that the driver of the white pickup truck could be involved in the armed robbery. Therefore, the Court finds that *Brown* and *Green* do not support plaintiff's argument that Officers Hayes and Hall had their reasonable suspicion dispelled once Mr. Lord got out of the pickup truck.

## B. Arrest of Plaintiff

The Court now addresses the constitutionality of Lord's arrest. The officers contend that the suspicion of criminal activity ripened into probable cause that Mr. Lord had violated Colorado law when Mr. Lord resisted Officer Hall's attempts to stop him from returning to the truck.[8]   Docket No. 44 at 15. Because of Mr. Lord's resistance,

---

[8]Although plaintiff does not fully argue this point in his response, in order to recover under an unlawful arrest claim, he must establish that his arrest was not based on probable cause. *See* Docket No. 1 at 5, ¶ 24. The scope of an investigative detention must be reasonably related to the suspicion that justified the detention in the first place. *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002). When the scope exceeds the justification, it becomes an arrest, and therefore, must be supported by probable cause. *Id*. Here, the scope of the investigative stop was to determine whether Mr. Lord was a suspect in the robbery. However, the officers did not release Mr. Lord once it was determined that he was not a suspect in the robbery. Accordingly, the officers must have probable cause for extending Mr. Lord's seizure beyond the

the officers arrested him and charged him with obstructing a peace officer in violation of

Colo. Rev. Stat. § 18-8-104(1)(a).

When a § 1983 action is based on a warrantless arrest, the arresting officer is

entitled to immunity if a reasonable officer could have believed that probable cause

existed to arrest the plaintiff. *Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir.

1995). Probable cause exists if the facts and circumstances within the arresting

officer's knowledge and of which he has reasonably trustworthy information are

sufficient to lead a prudent person to believe that the arrestee committed or is

committing an offense. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir.

2004).

Mr. Lord was arrested for obstructing a police officer. Under Colo. Rev. Stat.

§ 18-8-104, a person is guilty of obstructing a police officer "when, by using or

threatening to use violence, force, physical interference, or an obstacle, such person

knowingly obstructs, impairs, or hinders the enforcement of the penal law or the

preservation of the peace by a peace officer, acting under color of his or her official

authority." The Court finds that the officers had probable cause to arrest Mr. Lord

because he interfered with the officers' investigation of the robbery. Mr. Lord failed to

obey Officer Hall's commands, resisted Officer Hall's efforts to place him in handcuffs,

and continued to struggle after Officer Hall brought him to the ground. Under such

circumstances, the officers had probable cause to arrest Mr. Lord for obstructing their

investigation. *Illinois v.* Gates, 462 U.S. 213, 245 n. 13 (1983) ("probable cause

_____

scope of the investigative stop.

requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").  Based on the plain language of the obstruction statute, the officers could reasonably believe that Mr. Lord's failure to obey commands and Mr. Lord's physical resistance obstructed, impaired, or hindered their investigation of the armed robbery.  *See Kaufman v. Higgs*, No. 10-cv-00632-LTB-MEH, 2011 WL 3268346, at *4 (D. Colo. July 29, 2011) (police officers had probable cause to arrest suspect for obstruction of their hit-and-run accident investigation where suspect asserted a privilege and refused to identify the driver of his vehicle).

Plaintiff has not identified facts to support the conclusion that the officers' arrest was made without reasonable suspicion and probable cause.  Defendants are entitled to summary judgment on plaintiff's Fourth Amendment claim of unlawful arrest.

## C.   Excessive Force Claim

Mr. Lord argues that Officer Hall used excessive force during the traffic stop when he placed his hand underneath Mr. Lord's chin, threw Mr. Lord to the ground, and left Mr. Lord in handcuffs for an extended period of time.  Docket No. 47 at 18-19.  Mr. Lord also alleges that Officer Hayes used excessive force when he struck his shoulder blade four times with a closed fist.  *Id*. at 19.  Mr. Lord contends that any use of force by the officers could not have been objectively reasonable because he did not match the description of the robbery suspect.  *Id*. at 16-17.  Additionally, Mr. Lord claims that he could not have been perceived as a danger by the officers because he voluntarily pulled his vehicle over to the side of the road and approached the patrol car in a non-threatening manner.  *Id*. at 17.  Moreover, Mr. Lord states that the officers' failure

to draw their weapons shows that they were not threatened by his behavior.  Finally, Mr. Lord argues that he did not act in the manner described by the officers because it does not comport with his usual temperament.  *Id*.

For excessive force claims, the ultimate issue is whether the officers' use of force was objectively reasonable in light of the surrounding facts and circumstances as seen from the perspective of a reasonable officer at the scene.  *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  That analysis is conducted "acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  *Buck*, 549 F.3d at 1287-89 (citation omitted).  To make this determination, a court must evaluate the totality of the circumstances and balance several factors including the severity of the alleged crime, the degree of threat that the suspect posed to the officers, and the cooperation, or lack thereof, by the suspect.  *See Thompson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009).  This reasonableness standard for excessive force claims is "clearly established" for purposes of qualified immunity analysis under § 1983.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002).

With respect to the severity of the crime, the officers performed the traffic stop during an investigation of a serious felony.  *See* Colo. Rev. Stat. § 18-4-302(3) ("Aggravated robbery is a class 3 felony and is an extraordinary risk crime").  According to the dispatch report, the robber used a semi-automatic handgun to commit the crime and, though no shots were fired, the use of a weapon increased the danger associated with the stop.  *See Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008)

(finding that, where officers receive no information about whether the robber was armed or unarmed, it was reasonable for officers to point guns at occupants of suspected vehicle); *cf. Silvan W. v. Briggs*, 309 F. App'x 216, 224 (10th Cir. 2009) (finding that an officer did not use excessive force because he was aware that the individuals arrested could have possessed a weapon).

Additionally, the officers had reason to believe that Mr. Lord posed "an immediate threat to [their] safety." *Graham*, 490 U.S. at 396. Although Mr. Lord got out of his truck with his hands held in a non-threatening manner, Mr. Lord yelled obscenities at the officers, did not obey Officer Hall's commands, and paced back and forth in a manner indicating to Officer Hall that he might try to flee the scene.[9] Moreover, Mr. Lord's attempt to return to the truck increased the threat to the officers' safety because the officers did not know whether there was another individual in the truck or if Mr. Lord had a weapon in the vehicle. *See Michigan v. Long*, 463 U.S. 1032, 1051-152 (1983) (finding that, during a *Terry* stop, officers may investigate a vehicle for potential weapons because the suspect is not arrested and may eventually have access to weapons, if any, inside the vehicle); *United States v. Boden*, 854 F.2d 983, 994 (7th Cir. 1988) (holding that a protective search inside the vehicle was reasonable even

---

[9]The officers did not know Mr. Lord voluntarily pulled over to the side of the road. The officers encountered the pickup truck already stopped on the side of the road. Plaintiff argues that it was unreasonable for the police officers to confuse a crew cab and a single cab truck. The Court finds that it was reasonable for the officers to investigate Mr. Lord's vehicle, the difference between a single cab pickup and an extended cab pickup not being so great as to make such a mistake by a witness unlikely, especially given that the color of the truck, the age (ten to fifteen years old), and the model (full-size American), were all consistent with the description of the vehicle provided by dispatch.

though the subject was outside the vehicle, because there was a continuing possibility that the suspect could return to the car).  Under these circumstances, Officer Hall's decision to stop Lord from re-entering the vehicle was objectively reasonable.  *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (finding that, during a *Terry* stop, police officers may use force to the extent that "such steps [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [the] stop."); *see also Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.").

To the extent Mr. Lord argues that the officers should have performed a felony stop if they were concerned about their safety, the Court disagrees.  The touchstone of the Fourth Amendment is reasonableness, and once the Court finds that the officers' actions were reasonable it need not "imagine some alternative means by which the objectives of the police might have been accomplished."  *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985).[10]

Finally, after Officer Hall attempted to prevent Mr. Lord from reaching the truck, Mr. Lord "actively resist[ed] arrest" and "attempt[ed] to evade arrest."  *Graham*, 490 U.S. at 396 (whether the suspect is evading arrest by attempting to flee the scene is a

---

[10]The Court also finds that it was reasonable for the officers not to increase the danger of the traffic stop by needlessly brandishing their weapons.

factor to consider in determining reasonableness).[11]  Mr. Lord disputes the officers'

account of the events, even though he has no recollection of them, by presenting

affidavits about his general disposition for nonviolence.  *See, e.g.,* Docket No. 47-22.

These affidavits do not create a genuine dispute of fact because they do not call into

question the factual allegations provided by Officers Hall and Hayes for nonviolence.

*See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (to defeat a

motion for summary judgment, evidence, including testimony, must be based on more

than mere speculation, conjecture, or surmise).  According to Officer Hall, Mr. Lord

resisted his attempts to place him in handcuffs by violently spinning out of Officer Hall's

grasp, raising his hand, and flailing his arms, shoulders, and legs.  Consequently,

Officer Hall's use of force was reasonable to regain control of the situation.  *See Latta*

*v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997) ("this case presents the classic situation

in which a plaintiff's own actions in reaction to a legitimate law enforcement encounter

result in escalating volatility and danger justifying the subsequent actions of the law

enforcement officers involved.").

Based on the foregoing, the Court concludes that the application of force by

Officer Hall, i.e., grabbing Mr. Lord underneath the chin, tackling him, placing his knees

into Mr. Lord's back, and handcuffing Mr. Lord, was objectively reasonable.  The Court

also finds that the amount of force used by Officer Hayes, i.e., striking Lord four times

with a closed fist on top of the shoulder blade, was objectively reasonable.  According

---

[11]Although Officer Hall was not attempting to "arrest" Mr. Lord at that time, the third *Graham* factor is applied to determine whether Mr. Lord resisted "seizure."  *See Graham*, 490 U.S. at 396.

to Officer Hayes' deposition and the police report, he struck Mr. Lord in the shoulder blade because Mr. Lord was attempting to tuck his left arm underneath his body and thereby potentially gaining access to a weapon.  Striking Mr. Lord four times in the shoulder was a reasonable use of force to gain control of Mr. Lord.  *See Novitsky*, 491 F.3d at 1254 (finding that it is reasonable for officers to take steps to protect their safety during *Terry* stops by "placing a suspect in handcuffs, or forcing a suspect to the ground.").

Mr. Lord submits affidavits from two experts, which he argues support his contention that the officers' conduct was unreasonable.  *See* Docket Nos. 47-6, 47-20. The expert affidavits do not, however, highlight a disputed issue of fact; rather, they simply contain the ultimate conclusion that the officers' use of force did not conform with accepted police guidelines and practices and, therefore, was excessive.  However, claims based on violations of police procedures are not actionable under § 1983. *Romero v. Bd. of Cnty. Comm'rs of Cnty. of Lake, State of Colo.*, 60 F.3d 702, 705 (state law and police procedure); *see also Davis v. Scherer*, 468 U.S. 183, 194-96 (1984) (rejecting the argument that § 1983 liability may be based solely on a violation of a state statute or regulation).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."  *Illinois v. Lafayette*, 462 U.S. 640, 647-48 (1983); *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005).  If the Court were to follow the experts' assertions regarding failure to perform a felony stop, the Court would be evaluating the officers' conduct from the perspective of 20/20 hindsight rather than from the perspective of an officer making split-second judgments on the

scene.  *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001).  The Court therefore follows the well-settled principle that an expert opinion is not sufficient to overcome summary judgment if "it is conclusory and thus fails to raise a genuine issue of material fact."  *Medina*, 252 F.3d at 1133 (citing *Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999)).

Because the Court finds that plaintiff has not identified facts supporting the conclusion that his constitutional right to be free of excessive force was violated, defendants are entitled to qualified immunity and summary judgment on plaintiff's Fourth Amendment claim of excessive force.

### D.   Tort Claim

Mr. Lord also asserts that the officers are not immune from liability under the Colorado Governmental Immunity Act ("CGIA"), Colo. Rev. Stat. § 24-10-101 *et seq.*, because their actions were willful and wanton.  Docket No. 47 at 19.

The CGIA governs circumstances under which a person may maintain a tort action against the State of Colorado, its political subdivisions, instrumentalities, and employees.  *See Mesa Cnty. Valley Sch. Dist. No. 51 v. Kelsey*, 8 P.3d 1200, 1203 (Colo. 2000).  The CGIA provides that public entities are immune from all claims that lie or could lie in tort, unless the claim falls within one of the eight limited areas for which immunity has been waived.  *See* Colo. Rev. Stat. § 24-10-105-106.

Under the CGIA, a public employee is immune from liability on tort claims arising out of an act or omission of the employee during the performance of his or her duties and within the scope of his or her employment.  Colo. Rev. Stat. § 24-10-118.

24

However, public employees are not immune from tort claims if their acts or omissions causing the injury were willful and wanton.[12]  Colo. Rev. Stat. § 24-10-118(2).  The CGIA defines "public employee" to include officers and employees of public entities. The Court finds that the officers in this case are public employees within the meaning of the CGIA.[13]  *See* Colo. Rev. Stat. § 24-10-103(4).

Although the CGIA does not define the term "willful and wanton," the majority of Colorado courts to address the issue have applied the following definition contained in Colorado's exemplary damages statute: willful and wanton conduct is "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or the rights and safety of others, particularly the plaintiff."  Colo. Rev. Stat. § 13-21-102(1)(b); *Carothers v. Archuleta Cnty. Sheriff*, 159 P.3d 647, 650 (Colo. App. 2006); *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995); *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1141 (D. Colo. 2001).  Although these definitions are not specifically tailored to address Fourth Amendment violations, the Court will apply these principles to the facts of this case. *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (applying Colo. Rev. Stat. § 13-21-

---

[12]Defendants have not asserted that plaintiff failed to abide by the notice provisions found in Colo. Rev. Stat. § 24-10-109.  *See Aspen Orthopaedics & Sports Medicine, LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832, 839 n.4 (10th Cir. 2003) (noting that Colo. Rev. Stat. § 24-10-109(1) is jurisdictional bar to suit.).  The Court is satisfied that it has jurisdiction over the case as plaintiff alleges in the complaint that it made a request for monetary damages to the City of Colorado Springs.  Docket No. 1 at 1-2, ¶ 2.  *See also Mesa Cnty. Valley School Dist. No. 51 v. Kelsey*, 8 P.3d 1200, 1205 (Colo. 2000) (finding that a request for money highlights an intent to raise a claim and satisfies Colo. Rev. Stat. § 24-10-109(1)).

[13]Neither party disputes that the officers are public employees within the meaning of the CGIA.

102(1)(b) to a claim of willful and wanton conduct in violation of the Fourth Amendment by police officers).

Here, the challenged conduct includes Officer Hall pushing Lord into the back of the truck, Officer Hall tackling plaintiff, and Officer Hayes' four closed fist punches on Mr. Lord's shoulder blade.  The Court finds that the officers' actions were objectively reasonable and do not constitute willful or wanton conduct.  *See Wilson ex rel Wilson v. City of Lafayette*, No. 07-cv-02844-PAB-KLM, 2010 WL 1380253, at *10 (D. Colo. March 31, 2010) (finding police officer's use of force objectively reasonable was sufficient to find that police officer's conduct was not willful and wanton); *Sisneros v. Office of Pueblo Cnty. Sheriff*, No. 09-cv-01646-PAB-MJW, 2011 WL 882618, at *6 (D. Colo. March 10, 2011) (finding that, because plaintiff failed to show that the officer's actions were objectively unreasonable, he could not establish the officer's conduct was willful and wanton under the CGIA).  Defendants are therefore entitled to summary judgment on plaintiff's state law claim.

## IV.  CONCLUSION

Therefore, it is

**ORDERED** that defendants' Motion for Summary Judgment [Docket No. 44] is **GRANTED**.  It is further

**ORDERED** that summary judgment shall enter in favor of defendants and against plaintiff on all of plaintiff's claims.  It is further

**ORDERED** that the Trial Preparation Conference set for August 3, 2012 at 9:30 a.m. and the trial set for August 20, 2012 are **VACATED**.  It is further

26

**ORDERED** that this case is **DISMISSED**.

DATED July 31, 2012.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge